# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **Melissa Dovala,** | | **Case No. 1:16cv2511** |
| | **Petitioner,** | |
| -vs- | | **JUDGE PAMELA A. BARKER** |
| | | **Magistrate Judge James R. Knepp II** |
| **Teri Baldauf,**[1] **Warden,** | | |
| | **Respondent** | **MEMORANDUM OPINION AND ORDER** |

This matter is before the Court upon the Report & Recommendation ("R&R") of Magistrate Judge James R. Knepp II (Doc. No. 26), which recommends that the Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 filed by Petitioner Melissa Dovala be denied. Petitioner has filed Objections to the R&R. (Doc. No. 27.) For the following reasons, the Court respectfully declines to adopt the R&R and hereby conditionally grants the Petition, as set forth below.

## I.     Summary of Facts

Dovala's habeas petition challenges the constitutionality of her conviction and sentence for murder and other charges in the case of *State v. Dovala*, Lorain County Court of Common Pleas Case No. Case No. 04CR065398. The state appellate court summarized the facts underlying Dovala's conviction as follows:

> {¶ 2} Riley Smath was born on August 26, 2003. His mother, Eileen Callahan-Smath, originally planned to deliver Riley naturally, but doctors had to perform a cesarean

---

[1] When Petitioner commenced the instant action, she was incarcerated at the Ohio Reformatory of Women and properly named Warden Ginine Tim as Respondent, as Ms. Tim was the Warden of that institution at the time the Petition was filed. On October 16, 2020, Respondent notified the Court that the current Warden of the Ohio Reformatory of Women is Teri Baldauf. (Doc. No. 32 at fn 1.) Accordingly, the caption of this case is hereby changed to reflect that Ms. Baldauf is the proper party Respondent. *See* Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.

section when she failed to progress after many hours of labor. After the cesarean, doctors examined Riley and declared him to be a healthy baby. The only problem Riley ever exhibited was his spitting up during and after feeding.

{¶ 3} Mrs. Callahan-Smath initially took a leave of absence from her job as a schoolteacher so that she could care for Riley. By the end of January 2004, however, Mrs. Callahan-Smath was prepared to return to work and sought a child care provider for weekdays. She found Appellant's advertisement in the newspaper, met with her, and arranged to bring Riley to Appellant's house for day care beginning January 22, 2004.

{¶ 4} On February 6, 2004, Mrs. Callahan-Smath called Appellant after work to tell Appellant that she was running late to pick up Riley. Appellant informed her that something was wrong with Riley, that she could not wake him, and that he needed to go to the emergency room. After Mrs. Callahan-Smath arrived at Appellant's home, she rushed Riley to the hospital. Riley was pronounced dead shortly thereafter, and doctors later determined his death to be the result of blunt impact trauma to the head.

{¶ 5} After Riley's death, Detective Dan Jasinski interviewed Appellant at her home and recorded the interview on videotape. Appellant answered questions about her day with Riley, but denied that either she or one of the day care children hurt Riley in any way.

{¶ 6} On May 26, 2004, a grand jury indicted Appellant for murder pursuant to R.C. 2903.02(A), felony murder pursuant to R.C. 2903.02(B), felonious assault pursuant to R.C. 2903.11(A)(1), endangering children pursuant to R.C. 2919.22(B)(1), and involuntary manslaughter pursuant to 2903.04(A). Prior to the end of trial, the State dismissed the first count of murder. On July 5, 2005, the jury found Appellant guilty of the charges of felony murder, felonious assault, endangering children, and involuntary manslaughter. The trial court later held that the manslaughter conviction merged with the felony murder conviction and sentenced Appellant to an indefinite prison term of 15 years to life.

*State v. Dovala (Dovala I),* 2007 WL 2752395 at * 1 (Ohio App. 9th Dist. Sept. 24, 2007).

## II.    Procedural History

### A.    State Trial Court Proceedings

In May 2004, the Lorain County Grand Jury issued an indictment charging Dovala with (1) one count of murder in violation of Ohio Rev. Code § 2903.02(A) (Count One); (2) one count of felony murder in violation of Ohio Rev. Code § 2903.02(B) (Count Two); (3) one count of felonious

2

assault pursuant to Ohio Rev. Code § 2903.11(A) (Count Three); (4) one count of endangering children in violation of Ohio Rev. Code § 2919.22(B)(1) (Count Four); and (5) one count of involuntary manslaughter in violation of Ohio Rev. Code § 2903.04(A) (Count Five). (Doc. No. 7-1, Exh. 1.) Dovala pled not guilty. (Doc. No. 7-1, Exh. 2.)

Jury trial commenced on June 22, 2005. (Doc. No. 22 at PageID# 1084.) Prior to opening statements, the State nolled the murder charge set forth in Count One of the indictment and the remaining Counts were renumbered One through Four. (*Id*. at PageID# 1165.)

Dovala was represented at trial by attorneys James Burge and Laura Perkovic. (Doc. No. 22 at PageID# 1083.) As will be discussed in greater detail *infra*, Mr. Burge elected not to call an expert witness to testify at trial regarding either the cause of Riley's death, or the timeframe within which the injuries resulting in Riley's death occurred. [2] Rather, Mr. Burge determined that the best strategy would be to engage in a vigorous cross-examination of the State's medical witnesses, Lorain County Coroners Paul M. Matus, M.D., and John Daniels, M.D.

After a five-day trial, Dovala was found guilty of felony murder, felonious assault, endangering children, and involuntary manslaughter. (Doc. No. 7-1, Exh. 3.) On July 5, 2005, the state trial court found that the involuntary manslaughter conviction on Count Four merged into the

---

[2] Mr. Burge testified in deposition that he felt he was limited in his options for asserting a defense in light of Dovala's videotaped statement to police that  no other adults or children had been near Riley on the day of his death, nor had there been any accidents in the home that could have explained Riley's injuries. *See State v. Dovala*, 2011 WL 2533915 at * 7 (Ohio App. 9th Dist. June 27, 2011). In addition, Burge testified that the coroner's estimate that the injury occurred between three to five hours before Riley's death, coupled with his own experience in similar cases, precluded any attempt to suggest that another party, such as Riley's parents, could have caused the injury. *Id. See also* Doc. No. 22 at Tr. 10-11, 35-38; PageID# 1953-1954, 1978-1981. Lastly, Burge testified that he based his decision not to introduce expert testimony, in part, on the "opinion" of Ms. Perkovic's husband (incorrectly identified by Burge as "Dr. Watson," but actually named Tom Swanson, M.D.) who was a neurologist. The circumstances surrounding this "opinion" were the subject of several state court proceedings and will be discussed in detail *infra*.

3

felony murder conviction on Count One.  (*Id.*)  Dovala was sentenced to an aggregate prison term of fifteen years to life on the remaining convictions.  (*Id.*)

**B.      Direct Appeal**

On August 1, 2005, Dovala, through new counsel, filed a timely notice of appeal in the Ninth District Court of Appeals (hereinafter "state appellate court").  (Doc. No. 7-1, Exh. 4.)  Dovala's appeal was initially dismissed for failure to file a brief.  (*Id.* at Exh. 9.)  However, the state appellate court later granted Dovala's Ohio App. R. 26(B) Application to reopen that appeal.  (*Id.* at Exh. 15.)

In her merit brief, Dovala raised six grounds for relief.  (*Id.* at Exh. 16.)  She did not assert claims of ineffective assistance of trial counsel based on Mr. Burge's failure to investigate, failure to obtain an independent forensic evaluation, and/or failure to present expert testimony to contest the State's expert testimony at trial.  (*Id.*)  On September 24, 2007, the state appellate court affirmed Dovala's convictions and sentence.  *See State v. Dovala*, 2007 WL 2752395 at * 1 (Ohio App. 9th Dist. Sept. 24, 2007).

Dovala, through counsel, filed a timely notice of appeal to the Supreme Court of Ohio.  (Doc. No. 7-1, Exh. 20.)  Dovala then filed her merit brief, in which she raised five grounds for relief.  (*Id.* at Exh. 21.)  Once again, none of these grounds raised ineffective assistance of trial counsel based on Mr. Burge's failure to investigate.  (*Id.*)  On February 20, 2008, the Supreme Court of Ohio denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  (*Id.* at Exh. 23.)

**C.      Petition to Vacate or Set Aside Sentence**

On June 2, 2006, while her direct appeal was pending, Dovala filed a Petition to Vacate or Set Aside Judgment and Sentence in the state trial court, claiming (among other things) that she had

4

been denied the effective assistance of trial counsel.  (*Id*. at Exh. 24.)  Specifically, as relevant herein,

Dovala asserted the following claims:

> 1.  Petitioner Dovala's conviction and sentence are void and/or voidable because his [sic] trial counsel's performance was deficient in that they [sic] failed to fully prepare for trial and failed to fully investigate the state's case against Petitioner, and failed to obtain an independent forensic evaluation.
>
> 2.  Petitioner Dovala's conviction and sentence are void and/or voidable because trial counsel's performance was deficit [sic] in failing to present expert testimony to contest the state's expert testimony.
>
> 3.  Petitioner Dovala's conviction and sentence are void and/or voidable because her trial counsel's performance was deficient in that he failed to fully investigate the theory they presented at trial and failed to demonstrate through expert evidence and legal argument that theory.

(*Id*.)

In support of her Petition, Dovala attached the affidavit of neurologist Audrius Plioplys, M.D.

(Doc. No. 7-1 at Exh. 24, PageID#s 283-285.)  Therein, Dr. Plioplys opines that "the cause of the

skull fracture of Riley Smath was not blunt force trauma, since such an injury would have caused

bruising and bleeding of blood vessels in the scalp and evidence of brain injury."  (*Id*.)  Rather, Dr.

Plioplys states that Riley suffered a head injury which resulted in a compression-based skull fracture

and that "because of the malleable nature of the skull bone of a five-month old infant, it would not

require great compressive force to cause the skull fracture suffered by Riley Smith and this force

could have been accomplished by the normal physical strength and body weight of a child four years

of age or older."[3]  (*Id*.)  Further, Dr. Plioplys states that "there is no medical reason why the head

---

[3] In her videotaped interview with the police, Dovala stated that, on the day of Riley's death, there were several other children in her house varying in age from three to eight years old, including Dovala's four-year old son Justin.  (Doc. No. 7-1 at PageID# 352-353, 365, 375, 377, 386.)

injury to Riley Smath necessarily occurred after 3:00 p.m. on February 6, 2004" and that "based upon neuropathology of the red and white blood cells of the cerebral hematoma, the injury could have been caused anytime between approximately one day prior to death."[4] (*Id*.)

On July 24, 2008, the state trial court denied Dovala's petition. (*Id*. at Exh. 30.) Upon motion, the state trial court later issued Findings of Fact and Conclusions of Law, in which it further explained that Dovala's petition was denied on the basis of *res judicata*. (*Id*. at Exh. 32.)

Dovala, through counsel, filed a timely appeal to the state appellate court and merit brief in support thereof. (*Id*. at Exhs. 33, 34.) The State filed a brief in opposition, to which Dovala replied. (*Id*. at Exhs. 35, 36.) On March 30, 2009, the state appellate court found that the trial court was incorrect in concluding that all of Dovala's ineffective assistance of trial counsel claims were barred by *res judicata*. *State v. Dovala* (*Dovala II*), 2009 WL 806847 (Ohio App. 9th Dist. March 30, 2009.) Specifically, the appellate court concluded that the following claims were not barred by that doctrine: ineffective assistance for failing to: (1) fully prepare for trial, (2) fully investigate the State's case, (3) obtain an independent forensic evaluation, (4) present expert testimony to challenge the State's expert evidence, (5) fully investigate their theory of the case, and (6) support their theory of the case. *Id*.

Upon remand, the state trial court scheduled a hearing on Dovala's post-conviction petition. Prior to the hearing, the parties deposed Mr. Burge regarding his preparation for trial and his thought

---

[4] In addition, Dovala attached the affidavit of criminal defense attorney Harry Reinhart, who opined that Mr. Burge's performance was deficient due to his failure to (1) obtain an independent forensic evaluation, (2) consult a forensic pathologist or independent coroner, and/or (3) present expert testimony in support of the defense theory advanced at trial of "gene point mutation which produced a weakness in the skull which resulted in a progressive crack." (*Id*. at Exh. 24, PageID# 313-314.)

process regarding the need for expert testimony.  The state appellate court summarized Mr. Burge's

testimony as follows:

> {¶ 8} In his deposition testimony, Burge testified that he has practiced criminal law
> for thirty years. Throughout that time, he has defended four infant homicides before
> representing Dovala, taking three of those cases to trial. Based on his experience, he
> understood that the trauma to the head generally occurred close in time to the infant's
> death. Further, at the point he was retained by Dovala, she had made several statements
> to the police, one of which was video recorded and admitted into evidence at trial. In
> those statements and in her testimony at trial, Dovala stated that it was "absolutely
> not" possible that one of the other children could have done anything to Smath that
> day, and further, that there were no accidents or other adults present in the house that
> could have caused his injuries. Burge explained that these statements made it very
> difficult to mount a defense that another party had caused the fatal injuries to Smath.
> He did, however, discuss the case with Dr. Francis Bartek, a physician specializing in
> obstetrics and gynecology ("OB/GYN") who had testified in the past for one of
> Burge's clients, and Dr. Tom Watson,[5] a neurologist, who was also the spouse of
> Burge's co-counsel. Though neither physician prepared a report on the case, Dr.
> Bartek, who was compensated $2,000 in December 2004 for his analysis, suggested
> there might be a congenital weakness in the skull and reviewed Smath's medical
> records from birth. Dr. Bartek gave Burge the name of two other physicians who could
> conduct genetic testing to determine if there was such a weakness in Smath's skull,
> one of whom was Dr. Brian Clark. Burge testified that Dr. Clark was able and willing
> to perform the testing on Smath's parents and that the Smaths had agreed to submit
> DNA samples for testing. Burge discussed this strategy with Dovala and informed her
> of the ramifications of the test results on her defense, particularly if the test
> demonstrated that there was not any congenital weakness. Burge stated he left the
> decision up to Dovala, and that she instructed him not to pursue the testing. We note
> that Dovala disputes Burge's testimony, testifying in her deposition that she left the
> decision up to Burge and was under the impression that the testing had been done,
> until she learned just weeks before her trial that it had not, in fact, been done.
>
> {¶ 9} According to Burge, Dr. Watson, who was not compensated for his assessment
> of the case, reviewed both the medical records and the autopsy report and concluded
> that Smath's trauma was the result of an "inflicted injury" and that "the onset of
> symptoms [from the injury] would have occurred very quickly."[6] Dr. Watson further
> indicated to Burge that "whoever inflicted it knew they did it." Burge stated that he

---

[5]  As noted *supra*, it was later determined that Mr. Burge misremembered this doctor's name.  In fact, "Dr. Watson" is neurologist, Tom Swanson, M.D., the now-former husband of Mr. Burge's co-counsel Laura Perkovic.

[6]  As will be discussed *infra,* the state trial court later determined that "Dr. Watson" (i.e., Dr. Swanson) did not, in fact, render any opinion regarding the onset of symptoms or timing of the injuries that caused Riley's death.

> consulted with Dr. Watson approximately three months before the matter was set for trial and that Dr. Watson attended portions of the trial as well. Burge admitted that he did not pursue further questioning with Dr. Watson as to the discrepancies between the internal and external damage to Smath's skull, in part because of Dr. Watson's assessment, but also based on Burge's own experience and research with the nature of the head injuries in these cases. For these reasons, he considered it "unrealistic" to consult with another physician in an attempt to develop an alternative cause of death.

*State v. Dovala* (*Dovala III*), 2011 2533915 at * 3-4 (Ohio App. 9th Dist. June 27, 2011). Dovala was also deposed prior to the hearing on her post-conviction petition. (Doc. No. 22 at PageID# 1897-1941.)

The hearing on Dovala's post-conviction petition was held on April 30, 2010. (Doc. No. 22 at PageID# 2029-2189.) The deposition testimony of both Mr. Burge and Dovala were entered into evidence. (*Id*. at PageID# 2030.) *See also* Doc. No. 7-2 at PageID#s 959-960. In addition, the record reflects that Dovala called three witness: (1) Dr. Plioplys; (2) Dovala's mother, Margaret Heinman; and (3) criminal defense attorney Mark Devan. (Doc. No. 22 at PageID# 2029-2189.) The State did not call any witnesses. (*Id*.)

On August 23, 2010, the state trial court found that Dovala had not shown ineffective assistance of trial counsel and denied her Petition for Post-Conviction Relief. (Doc. No. 7-2 at Exhs. 40, 41.) Dovala timely appealed, raising one assignment of error:

> The judgment of the trial court is contrary to the manifest weight of the evidence and constitutes an abuse of judicial discretion.

(*Id*. at Exh. 43.) The State filed a brief in opposition to which Dovala replied. (*Id*. at Exh. 44.) On June 27, 2011, the state appellate court affirmed the state trial court. *See Dovala III,* 2011 WL 2533915 at * 7-8.

Dovala timely appealed to the Supreme Court of Ohio, raising the following propositions of law:

8

I.      In a criminal case charging the murder of an infant, where the proof of causation of the injury is circumstantial, the duties of counsel for the defendant include: (1) conduct an objectively reasonable investigation of the medical basis of the evidence; (2) make an objectively reasonable effort to secure medical expert evidence that can be presented in defense; and (3) to prepare a medical defense that is available.

II.     A trial court misapplies the test for prejudice in the claims of ineffective assistance of counsel under *Strickland v. Washington* (1984) 466 U.S. 668; *State v. Bradley* (1989), 42 Ohio St.3d 136, by applying a standard of prejudice that, but for the deficient legal representation, another outcome "would probably be different."

(Doc. No. 7-2, Ex. 47.)  On November 2, 2011, the Supreme Court of Ohio denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  (*Id.* at Ex. 48.)

### D.      First Federal Habeas Petition

On January 29, 2013, Dovala, through counsel, filed a Petition for Writ of Habeas Corpus in this Court, in which he asserted six grounds for relief.  *See Dovala v. Tim*, Case No. 1:13cv213 (N.D. Ohio) (Polster, J.) (Doc. No. 1).  Dovala's sixth ground for relief asserted ineffective assistance of counsel, as follows:

**GROUND SIX**:  Petitioner was deprived of the effective assistance of trial counsel based on a failure to fully prepare for trial, failure to fully investigate the state's case against Petitioner, fail[ure] to obtain an independent forensic evaluation, failure to present expert testimony to contest the state's expert testimony, failure to fully investigate the theory presented at trial and failure to demonstrate a theory based on expert evidence and legal argument.

**Supporting Facts**: Trial counsel performed deficiently when he failed to fully prepare for trial, fail[ed] to fully investigate the state's case against Petitioner, failed to obtain an independent forensic evaluation, fail[ed] to present expert testimony to contest the state's expert testimony, fail[ed] to fully investigate the theory presented at trial and fail[ed] to demonstrate a theory based on expert evidence and legal argument. No deference should be afforded to the state court findings. These claims were supported by evidence outside the record and raised in a timely postconviction petition. Depositions were taken and a hearing was held. The trial court denied the petition. Petitioner appealed this to the Ninth District Court of Appeals and then to the Ohio Supreme Court. Petitioner discovered evidence that contradicted the testimony

9

provided in a deposition and relied upon by the trial court and therefore submitted this evidence to the trial court by way of a Motion for Relief under Civ. R. 60(B).

*Id*. *See also* Doc. No. 7-2, Ex. 49.  Dovala subsequently moved to stay her habeas petition pending the exhaustion of Ground Six.  *See Dovala v. Tim*, Case No. 1:13cv213 (Doc. No. 3.)  Respondent moved to dismiss.  *Id.* at Doc. No. 5.  Dovala then filed a response in opposition and a motion to supplement her motion to stay.  *Id.* at Doc. Nos. 8, 9.

On August 26, 2013, Magistrate Judge Kenneth McHargh issued a Report & Recommendation, in which he recommended that (1) Dovala's first five grounds for relief be dismissed as time-barred, and (2) her sixth ground for relief (set forth above) be dismissed as unexhausted.  *See Dovala v. Tim*, Case No. 1:13cv213 (Doc. No. 11.) The Magistrate Judge also recommended that Dovala's Motion to Stay should be denied.  *Id*.  Dovala filed Objections. *Id.* at Doc. No. 12.

On September 18, 2013, District Judge Dan Polster overruled Dovala's Objections and adopted the Report and Recommendation, denying the Petition as time-barred with respect to Grounds One through Five and dismissing without prejudice Dovala's Sixth Ground for Relief.  *See Dovala v. Tim*, Case No. 1:13cv213 (Doc. No. 13.)  Dovala did not file an appeal to the United States Court of Appeals for the Sixth Circuit.

### E.  State Trial Court Motion for Relief under Ohio Civ. R. 60(b)

Meanwhile, on January 25, 2013, Dovala filed a Motion for Relief from Judgment under Ohio Civ. R. 60(b) in the state trial court.  (Doc. No. 7-2, Exh. 53.)  Therein, Dovala stated that "[o]n January 23, 2013, two days ago, undersigned counsel received an affidavit from Dr. Thomas Swanson

10

(not "Watson" as Hon.  James Burge[7] referred to him), seriously calling into question the veracity

and reliability of Hon. James Burge's testimony as well as the validity of this Court's decision."  (*Id*.)

Dovala argued that "[a]ccording to Dr. Swanson, he never consulted with [] James Burge about this

case."  (*Id.*)

     In an affidavit attached to the Motion, Dr. Swanson avers as follows:

1.    I am a Board Certified Clinical Neurologist, Licensed in Montana and Wyoming. I obtained my medical degree in 1986 from Wayne State University School of Medicine. My Curriculum Vitae is attached further detailing my qualifications.

2.     I have never been referred to by the name "Tom Watson."

3.    From 2000- 2006 I was married to Laura Perkovic, an attorney licensed in the state of Ohio.  At the time we were living in Northwestern Ohio where I [] owned and operated Midwest Neuroscience Inc., a neurology practice.

4.    Throughout my career, I have been retained as an expert to consult with attorneys and I keep records of all my engagements as a consultant.

5.    I have reviewed my records and notes from the time period of 2006 and found no records involving Melissa Dovala or Riley Smath.

6.    I was never asked to consult with James Burge or Laura Perkovic as an expert in Melissa Dovala's case.

7.    I have never had access to or reviewed any records pertaining to Melissa Dovala's case.

8.    I never discussed any aspects of this case with James Burge.  I did discuss this case with Laura Perkovic in a casual manner in our home.  I remember that there were severe brain injuries to the child including a skull fracture and some intracranial bleeds.  I did not officially opine anything regarding the mechanism of death of Riley Smath.  I did not have access to or review the records in any detail that would have allowed a learned opinion in this case.

---

[7] Burge served as a Lorain County Common Pleas Court judge from 2007 until he resigned in April 2015.

9.    I did not attend the trial of Melissa Dovala. I did appear in the courthouse for one day to support my wife, but she requested that I leave.  I was in the courthouse for less than 5 minutes, saw no testimony nor did I have any discussions with my wife or Mr. Burge.

(Doc. No. 7-2 at PageID#s 745-746.)

The State opposed Dovala's Motion, in which it provided an affidavit from Mr. Burge.  (Doc. No. 7-2, Exh. 54, Page ID#s 764-766.)  Therein, Mr. Burge avers that, during the pendency of the Dovala case, co-counsel Perkovic possessed a file "containing all matters furnished to the defense in pretrial discovery or otherwise, including but [not] limited to: the autopsy protocol, with photographs, and the medical records of the victim commencing from the day of birth."  (*Id*.)  He further states:

6.    That during preparation for the trial of the case, affiant variously inquired of Attorney Perkovic if she had discussed the theory of our defense with Dr. Swanson (uninflicted injury proximately caused by genetic and/or birthing related defects in the skull); and, that in a first response to my inquiry Attorney Perkovic replied that "Tom thinks it's cold-blooded murder," an answer followed by a discussion of the more obvious hospital and autopsy findings which would lead to that conclusion;

7.    That affiant believed the above response reflected Dr. Swanson's considered opinion, as this opinion could not have been formed without at least a cursory review of, or a discussion of the available records;

8.    That affiant believed Dr. Swanson's opinion, as expressed by Attorney Perkovic (murder), necessarily included his belief that, ruling out an accident, the victim's injury was inflicted, or caused purposely;

9.    That affiant did not challenge Attorney Perkovic in this regard, since Dr. Swanson's opinion, as expressed by Attorney Perkovic, was supported by the medical evidence, by the coroner's protocol, by Dr. Francis Bartek; a consulting physician retained by affiant, by defendant's denial that an accident could have occurred while the victim was in her care, and by the fact that no other explanation for the victim's constellation of injuries (concave skull fracture with closed fracture lines, subdural and subarchnoid hemorrhage, retinal hemorrhages) existed in the medical literature;

12

10.     That when Dr, Swanson appeared to observe Attorney Perkovic at trial, there was, in fact, discussion between the three of us which was consistent with Dr. Swanson's opinion, as previously expressed to affiant by Attorney Perkovic;

*Id.*

The state trial court conducted a hearing on Dovala's Motion on March 22, 2013.  (Doc. No. 7-2 at PageID# 774.)  At that time, the court granted Dovala's Motion to Expand the Record with a deposition of Ms. Perkovic.  *See State v. Dovala* (*Dovala IV*), 2014 WL 2522022 at * 2 (Ohio App. 9th Dist. June 2, 2014).  Ms.  Perkovic was subsequently deposed and a transcript was filed with the state trial court under seal.  *Id.*  During her deposition, Ms. Perkovic confirmed that Burge asked her to ask Dr. Swanson if he would "as a courtesy, render some type of case review."[8]  (Doc. No. 31 at Tr. 17-18.)  She described her conversation with Dr. Swanson about Mr. Burge's request as follows:

Q.     And did you discuss that with Dr. Swanson?

A.     Yeah.  Well, I didn't ask him if he would look at the case for free.  The conversation went -- the conversation was a little bit different. What happened was is I brought him -- I can't remember if I brought him the autopsy photographs or the autopsy report.  It was one or the other.  And – because I told Tom that Jim wanted to know if he could maybe have a look at it.

And Tom's response was basically -- he looked at whatever I gave him.  And right now, I can't recall what it was.  And he said -- you know, he identified it as brain trauma.  And he said 'Well, as it's brain trauma, I am qualified to discuss, you know, or consult with Jim on the case.  But I would have to be formally retained.'  And he wanted numerous other materials in order to form some kind of impression or opinion.  But he certainly was not willing to go

---

[8] Ms. Perkovic explained that it was not entirely clear what Mr. Burge wanted Dr. Swanson to render an opinion about, describing his request that she speak with Dr. Swanson as "pretty nebulous."  (Doc. No. 31 at Tr. 16, 19.)  Specifically, Ms. Perkovic testified that: "[I]t wasn't specified, which was -- which is what made it kind of awkward.  He wanted to see if Tom would have a look at the case or the materials. But at that point, it wasn't specified as to whether Jim [Burge] wanted Tom's opinion as to the theory of the [genetic condition] craniosynostosis or whether Tom would verify, you know, any of the statements in the coroner's report. It wasn't perfectly clear, which is why the conversation with Tom kind of stalled a little bit. Because Tom actually said 'I don't know what you want me' – 'What do you want to know from me and how do you want me to consult?' So, it wasn't specifically put.  I think that Jim maybe, for lack of any better term, was sort of fishing to see if Tom would be interested in being involved."  (*Id.* at Tr. 19.)

13

> any further or render any kind of casual opinion or give any kind of casual impression just by the review of whatever I had presented to him at the time.

(*Id*. at Tr. 18.)  Contrary to Mr. Burge's affidavit, Ms. Perkovic testified that (1) Dr. Swanson never communicated to her that this was a case of "cold-blooded murder;" and (2) she never communicated to Mr. Burge that Dr. Swanson held that opinion.  *See, e.g., Id*. at Tr. 25 ("Tom didn't render any opinions and certainly not the opinion that it was cold-blooded murder.")  *See also* Doc. No. 31 at Tr. 21, 30, 39-40.  In addition, and also contrary to Mr. Burge's affidavit, Ms. Perkovic testified that she did not recall that, during trial, Dr. Swanson and Burge had a conversation about Dr. Swanson having an opinion on the Dovala case.  (*Id*. at Tr. 27-28.)

On June 13, 2013, the state trial court issued a Judgment Entry denying Dovala's Motion. (*Id*. at Exh. 56.)  Therein, the court stated that it had "examined and compared the conflicting affidavits and depositions of Judge James Burge, Laura Perkovic, and Dr. Thomas Swanson."  (*Id*.) After summarizing the testimony and affidavits of Mr. Burge and Dr. Swanson, the trial court found as follows:

> Upon consideration of the foregoing this Court finds that the newly discovered evidence is impeachment testimony and merely cumulative.  This Court cannot find that trial counsel attempted to defile the Court by misrepresenting material facts relating to the issue of ineffective assistance of counsel.  Furthermore, the Court cannot say that the newly discovered evidence would necessarily have changed the Court's finding that the Petitioner was not entitled to postconviction relief.  Nor can the Court say that Judge Burge's statements interfered with the Court's task of impartial adjudication of the case.  Therefore, the Petitioner has failed to meet the standard of proof for the Court to grant relief from the Court's order denying the petition for postconviction relief.

(*Id*.)  Dovala, through counsel, timely appealed.  (*Id*. at Exh. 57.)  In her brief, Dovala raised a single assignment of error:

14

1.    The judgment of the trial court is contrary to the manifest weight of the evidence and constitutes an abuse of judicial discretion. Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

(*Id*. at Ex. 58.)  The State responded and Dovala replied.  (*Id*. at Exhs. 59, 60.)

On June 2, 2014, the state appellate court reversed and remanded.  *See State v. Dovala* (*Dovala IV*), 2014 WL 2522022 (Ohio App. 9th Dist. June 2, 2014).  Therein, the court noted that, although the trial court carefully summarized the testimony of Burge and Swanson, it made no mention of Perkovic's testimony.  *Id.* at * 3.  The court concluded that the trial court "did not fully analyze whether Dovala was entitled to relief" and that its "finding that the testimony of Dr. Swanson and Perkovic was merely cumulative evidence is not supported by the evidence."  *Id.* at * 4.

On October 10, 2014, the state trial court issued a supplemental Judgment Entry in which it again denied Dovala's Motion.  (Doc. No. 7-2, Exh. 62.)   The court explained as follows:

> The evidence in question relied upon by the trial court consisted of deposition testimony given by Petitioner's lead trial counsel James Burge.  Burge testified that he sought the opinion of a neurologist, Tom Watson, in his preparation for trial and that this neurologist confirmed that the injury sustained by R.S. was "an inflicted injury with the onset of symptoms which would have occurred very quickly".   The neurologist in question was Tom Swanson, who at the time was married to Burge's co-counsel Laura Perkovic.  In his affidavit Swanson claims to have consulted with attorneys in the past, kept records of all engagements, searched and found no records pertaining to this matter.  He further claims never to have consulted with either Burge or Percovic [sic] **as an expert** in the Dovala matter.  He did, however, discuss the case with Percovic [sic] and recalled the presence of severe brain injuries.  He says he did not **officially** opine anything regarding mechanism of death.  He says he did not have access to or review the records **in any detail..."that would have allowed a learned opinion in the case,"** (all emphasis added).
>
> On the other hand, Percovic [sic] testified that she brought materials relating to the case home and asked Swanson to look at it.  Percovic [sic] then says, "And Tom's response was basically -  he looked at whatever I gave him... And he said -  you know, he identified it as brain trauma. And he said "well it's brain trauma, I am qualified to discuss, you know, or consult with Jim on the case.  But I would have to be formally retained." (Percovic Tr. Page 18.)  Percovic [sic] further testified that she would bring articles and textbooks home and ask him to explain and clarify definitions.  And based

upon what she learned she would bring the information to Burge's attention. (Tr. Page 37 Line 21). Finally Percovic [sic] claims certain portions of Swanson's affidavit are not accurate, specifically his denial of access to or review of Dovala records. (Tr. Page 40).

The Court has, again, reviewed portions of the evidence before it. Dr. Swanson's affidavit is equivocal, careful and contradictory to other known facts in the case. The Court hesitates to rely upon it. With regard to Percovic's [sic] statements, this Court's reading of the facts is that Swanson did in fact render opinions to Percovic [sic], whether characterized as formal, informal, official or unofficial, who relayed them to Burge. This is a likely scenario in light of the fact that Burge hired Percovic [sic], not as an experienced second chair, but more likely due to her relationship with Swanson, a neurologist, whose experience could benefit the defense.

Conversely, the Court finds Burge did in fact consult with Swanson through Percovic [sic] in his preparation for trial and that Swanson confirmed the injury to be brain trauma. The Court does not find that Swanson opined that the onset of symptoms would have occurred very quickly, but this fact alone, did not inherently affect the accuracy and reliability of the trial court's judgment.

(*Id.*) (emphasis in original).

Dovala timely appealed. (Doc. No. 7-2, Exh. 63.) On March 31, 2016, the state appellate court affirmed. *See State v. Dovala* (*Dovala V*), 2016 WL 1295954 (Ohio App. 9th Dist. March 31, 2016).

Dovala timely appealed to the Supreme Court of Ohio. (Doc. No. 7-2, Exh. 68.) In her memorandum in support of jurisdiction, Dovala raised the following proposition of law:

1.  A trial court errs when it denies a Motion to Reopen Judgment despite presentation of evidence demonstrating unusual circumstances that, at the time of the original judgment, were not disclosed to the parties. *Strickland v. Washington* (1984), 466 U.S. 668; *State v. Bradley* (1989), 42 Ohio St.3d 136; *State v. Smith* (1985), 17 Ohio St.3d 98; *State v. Jackson* (1980), 64 Ohio St.2d 107; U.S. Const. Amends. VI, XIV; Ohio Const. Art I §§ 1, 10.

(*Id.* at Exh. 69.) The State filed a memorandum in opposition. (*Id.* at Exh. 70.) On August 31, 2016, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to Supreme Court Practice Rule 7.08(B)(4). (*Id.* at Exh. 71.)

### F.    Second Federal Habeas Petition

Dovala filed the instant habeas petition through counsel on October 13, 2016.  (Doc. No. 1.)

Therein, she raised the following sole ground for relief:

> **GROUND FOR RELIEF**: Petitioner was deprived of the effective assistance of trial counsel based on a failure to fully prepare for trial, failure to fully investigate the state's case against Petitioner, fail[ure] to obtain an independent forensic evaluation, failure to present expert testimony to contest the state's expert testimony, and failure to fully investigate the theory they present[ed] at trial and failure to demonstrate through expert evidence and legal argument the theory.
>
> **Supporting Facts**: Trial counsel performed deficiently when he failed to fully prepare for trial, failed to fully investigate the state's case against Petitioner, failed to obtain an independent forensic evaluation, fail[ed] to present expert testimony to contest the state's expert testimony, failed to fully investigate the theory they presented at trial, and failed to demonstrate through expert evidence the legal argument the theory. No deference should be afforded to the state court findings.

(Doc. 1-2 at p. 7). Respondent filed a Motion to Transfer the Petition (Doc. 7), asserting it was a second or successive petition.  The Magistrate Judge recommended that the Motion to Transfer be granted, and Dovala filed Objections.  (Doc. Nos. 13, 16.) Then-assigned District Judge Dan Polster overruled the Objections and transferred the Petition to the Sixth Circuit.  (Doc. 18.)

On March 15, 2018, the Sixth Circuit vacated the transfer and remanded, holding the instant Petition is not "second or successive" within the meaning of 28 U.S.C. § 2244(b) because the instant claim, raised in her first habeas Petition "was dismissed without prejudice for failure to exhaust."[9] *Dovala v. Tim*, Case No. 17-4009 (6th Cir. Mar. 15, 2018).

---

[9] The court explained: "A petition is not properly considered second or successive 'if the first petition was dismissed for lack of exhaustion.' *In re Campbell*, 874 F.3d 454, 459 (6th Cir. 2017) (citing *Slack v. McDaniel*, 529 U.S. 473, 478, 487 (2000)). On the other hand, if a petitioner files a mixed petition containing both exhausted and unexhausted claims and then chooses to 'proceed with only the exhausted claims,' a subsequent petition is properly considered second or successive. *Burton v. Stewart*, 549 U.S. 147, 154 (2007). Dovala's case is not like *Burton*. Here, both parties, as well as the magistrate and district judges, made clear their erroneous assumption that dismissal of the unexhausted claim would preserve it, notwithstanding the dismissal with prejudice of the other claims. This universal error meant that Dovala did not make a choice like the one made in *Burton*. Throughout the litigation of her first petition, Dovala pursued both her

17

Following remand, Respondent filed an Answer (Doc. 21), and Petitioner filed a Traverse (Doc. 25.)  The matter was then re-assigned to the undersigned pursuant to General Order 2019-13.

On October 30, 2019, the Magistrate Judge issued a Report & Recommendation that Dovala's Petition be denied.  (Doc. No. 26.)  After reciting the highly deferential standard for reviewing claims of ineffective assistance of counsel on habeas review, the Magistrate Judge found that it was not unreasonable for the state courts to determine that Mr. Burge's representation was not deficient because Burge consulted with two physicians (i.e, Dr. Bartek and Dr. Swanson) before deciding that further investigation into the issue of causation was unnecessary.  (*Id.*)

Dovala filed Objections.  (Doc. No. 27.)  Therein, Dovala specifically objects to the Magistrate Judge's finding, conclusion, and rationale that trial counsel was not ineffective because he consulted with Dr. Swanson.  (*Id.* at p. 4.)  In particular, Dovala complains that the Magistrate Judge failed to fully analyze or discuss (1) Dr. Swanson's affidavit contradicting Mr. Burge's deposition testimony; (2) Mr. Burge's subsequent affidavit; or (3) Ms. Perkovic's deposition testimony corroborating Dr. Swanson's affidavit.  (*Id.* at p. 5-6.)  Dovala also objects generally to the Magistrate Judge's conclusion that Mr. Burge's performance was not deficient under *Strickland v. Washington*, 466 U.S. 668 (1984).

Respondent did not file a response to Dovala's Objection.

Upon this Court's review, it was not apparent that Ms. Perkovic's deposition was included in the state court record filed by the Respondent in this action.  On October 8, 2020, this Court issued an Order directing Dovala to either (1) file Ms. Perkovic's deposition and exhibits in the instant

---

exhausted and her unexhausted claims, showing no indication of abandoning any of them. The relevant claim was then dismissed without prejudice for failure to exhaust.  Because in the very unusual circumstances of this case Dovala never made the choice to forgo the merits of her previously unexhausted claim, this petition is not 'second or successive.'"  *Id.*

action; or (2) clearly identify (by both Doc. No. and PageID#s) the location of the above documents in the record of the above-captioned matter.  (Doc. No. 29.)  In addition, Dovala was ordered to state whether the above documents were part of the record before the state court.  (*Id*.)

On October 12, 2020, Dovala filed a Supplement which included the transcript of Ms. Perkovic's April 2013 deposition as well as some of the exhibits from that deposition.  (Doc. No. 31.)  In addition, counsel for Dovala swore that Ms. Perkovic's deposition and exhibits were part of the record before the state courts.  (*Id*.)

On October 16, 2020, Respondent filed a response to Dovala's Supplement, in which she acknowledged that Ms. Perkovic's deposition was filed under seal in the state trial court on May 2, 2013.  (Doc. No. 32.)  Respondent states that "due to a clerical error, these items were overlooked and were not requested from Lorain County."  (*Id.* at p. 2.)

## III.    Standard of Review

Parties must file any objections to a report & recommendation within fourteen days of service.  Fed. R. Civ. P. 72(b)(2).  Failure to object within this time waives a party's right to appeal the district court's judgment.  *See Thomas v. Arn*, 474 U.S. 140, 145 (1985); *United States v. Walters*, 638 F.2d 947, 949-950 (6th Cir. 1981).

When a petitioner objects to a magistrate judge's resolution of a dispositive matter, the district court reviews those objections *de novo*.  Fed. R. Civ. P. 72(b)(3).  Specifically, a district judge:

> must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

*Id*.  "A party who files objections to a magistrate [judge]'s report in order to preserve the right to appeal must be mindful of the purpose of such objections: to provide the district court 'with the

opportunity to consider the specific contentions of the parties and to correct any errors immediately.'" *Jones v. Moore*, 2006 WL 903199 at * 7 (N.D. Ohio April 7, 2006) (citing *Walters*, 638 F.2d at 949–50).

When a party fails to raise a specific objection to a finding of a magistrate judge on a dispositive matter, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  Fed. R. 72(b)(3), Advisory Committee Notes.  *See also Thomas*, 474 U.S. at 150 (stating that "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.")

## IV.  Legal Standard regarding AEDPA Petitions

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37 (2012); *Renico v Lett*, 559

U.S. 766 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Shimel v. Warren*, 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Moreover, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901 (2012).  *See also Lopez v. Smith*, 574 U.S. 1,  4 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  *See also Carter v. Bogan*, 900 F.3d 754, 767 (6th Cir. 2018).  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.  See also Shimel,* 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id*. at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785. The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87. This is a very high standard, which the Supreme Court readily acknowledged. *Id*. at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

## V.    Analysis

Here, Dovala's sole habeas ground for relief is ineffective assistance of trial counsel due to counsel's failure to (1) fully prepare for trial, (2) fully investigate the state's case, (3) obtain an independent forensic evaluation, (4) present expert testimony to contest the state's expert testimony, and (5) fully investigate the defense theory presented at trial and demonstrate that theory through expert evidence and legal argument.  (Doc. No. 1-2 at p. 7.)  It is undisputed that this claim is fully exhausted and was considered on the merits by the state courts.

The well-established federal law used for assessing ineffective assistance of counsel claims is the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* imposes a two-

part test for determining whether counsel was unconstitutionally ineffective. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). The first prong assesses counsel's performance.  Under this prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88.  In other words, a court assessing an ineffective assistance claim must "determine whether, in light of all the circumstances, the [challenged] acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. When making this assessment, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Second, in order to amount to a constitutional violation, the error by counsel must have been prejudicial to the defendant.  *Id.* at 691–92.  To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. ... The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 111–12.

Because the *Strickland* standard is general in nature, significant deference applies to state court decisions when assessing them under § 2254(d).  *Harrington*, 562 U.S. at 105.  On the cause prong in particular, the Supreme Court has described this review as "doubly deferential," because AEDPA provides deference to the state court, which in turn is expected to give considerable deference to trial counsel's decisions. *Woods v. Etherton*, —— U.S. ——, 136 S. Ct. 1149, 1151 (2016) (per

curiam) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)) (majority opinion)). Indeed, as explained by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland 's deferential standard.

*Harrington,* 562 U.S. at 105. *See also Kennedy v. Warren*, 428 Fed. Appx 517, 520 (6th Cir. May 3, 2011); *Phillips v. Sheldon*, 2014 WL 185777 at * 14-15 (N.D. Ohio Jan. 16, 2014).

Here, the state appellate courts addressed (and rejected) Dovala's ineffective assistance claim in two decisions; i.e. (2) the 2011 decision affirming the denial of Dovala's post-conviction petition; and (2) the 2016 decision affirming the denial of her Motion for Relief under Civ. R. 60(b). *See State v. Dovala*, 2011 WL 2533915 (Ohio App. 9th Dist. June 27, 2011); *State v. Dovala*, 2016 WL 1295954 (Ohio App. 9th Dist. March 31, 2016). In its 2011 decision, the state appellate court addressed Dovala's ineffective assistance claim as follows:

> {¶ 15} "[I]n Ohio, a properly licensed attorney is presum[ed] competent." *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. *Accord State v. Williams* (1991), 74 Ohio App.3d 686, 695. Additionally, "courts should decline second-guessing an attorney's trial strategy." *Williams*, 74 Ohio App.3d at 695, citing *State v. Hester* (1976), 45 Ohio St.2d 71, 74. The Supreme Court has further noted that "the failure to call an expert and instead rely on cross-examination does not

24

constitute ineffective assistance of counsel." *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, citing *State v. Thompson* (1987), 33 Ohio St.3d 1, 10–11.

{¶ 16} Dovala essentially argues that Burge was overconfident in his ability to defend her case based on his past experience of trying similar cases and over-relied on this experience and self-professed knowledge of medical issues, instead of seeking the expert opinions of trained medical professionals. In support of this assertion, Dovala offered the testimony of defense attorney Mark Devan. Devan testified that, based on his thirty-five years of experience as a criminal defense attorney, after reviewing the record in this case, it was "apparent that an expert was necessary on behalf of [ ] Dovala." He opined that Burge was deficient in presenting any theory of reasonable doubt throughout his cross-examination of either of the State's medical experts, the county coroner, Dr. Paul Matus, or his supervisor, Dr. John Daniels, both of whom performed the autopsy on Smath. Devan considered Burge's cross-examination of the county coroner, Dr. Matus, to be "strident and active" but "d[id] not believe it was effective" in that Burge failed to demonstrate any alternative theory as to how Smath died.

{¶ 17} In terms of the use of an expert, Devan agreed that it was appropriate to consult with an OB/GYN in this case, but considered that simply a starting point, viewing that type of physician as more of a referral source who could have directed Burge to the appropriate type of expert to engage for Dovala's defense. Devan argued that Burge was "talking to the wrong people" and should have consulted a pathologist "at a minimum" as well as a neurologist.

{¶ 18} Devan opined that Burge needed to "analyze the case further" to adapt his defense to accommodate Dovala's statements to police by suggesting that Smath's injuries might have occurred while he was temporarily out of her sight, attending to another child, or using the restroom. Because the time frame of the injury was critical to Dovala's defense, Devan believed that if an expert like Dr. Plioplys had been employed, Burge could have also argued that Smath's injuries occurred earlier in time when Smath was not under Dovala's care. Devan also criticized Burge's decision to pursue a defense theory that was not supported by science, as Burge admitted was the case here. Devan concluded that Burge's failure to pursue a professional, formal consultation with someone other than an OB/GYN fell below the standard of practice in this type of case. He further asserted that Burge's failure to interview either coroner before the trial constituted a breach of the duty he owed to Dovala and fell well beneath the reasonable standard for an attorney to prepare a defense for Dovala.

{¶ 19} Based on the foregoing observations, Devan concluded that Burge's performance fell below the reasonable standard of care and that Dovala was denied the effective assistance of counsel. He further stated that, had Burge engaged a competent expert to challenge how Smath's injuries occurred, a jury "would have acquitted her with that sort of evidence in this sort of case," and if not, that it was

25

probable that she would have been convicted of a lesser offense. Devan concluded his testimony by stating that he "believe[s] that [Burge's] experience got the best of him" and that he "just didn't go far enough * * * [or] ask the right questions."

{¶ 20} At his deposition, Burge stated that he was limited in his options for asserting a defense in light of Dovala's numerous statements to police that no other adults or children had been near Smath that day, nor had there been any accidents in the home. Burge reasoned that it would be inconsistent at trial to blame another person in the house that day for the injuries based on Dovala's statements. Additionally, Burge testified that the coroner's estimate that the injury had occurred between three to five hours before Smath's death, coupled with his own experience in similar cases, precluded any attempt to suggest that another party, such as Smath's parents, had caused the injury. Burge explained that based on his experience in similar cases, his discussions with Dr. Bartek and Dr. Watson, and the statements Dovala made to police before retaining him as counsel, he felt the best strategy to pursue in Dovala's defense would be to rely on a vigorous cross-examination of Dr. Daniels and Dr. Matus. The record reflects Burge did so, offering several medical journals and studies challenging the conclusion of Dr. Matus, so much so that Dr. Matus agreed there was a possibility, though remote, that there were factors that could lead to increased intracranial pressure and result in a fracture similar to the one suffered by Smath.

{¶ 21} Consistent with the Supreme Court's directive, this Court has rejected the assertion that trial counsel is ineffective if he elects not to put forth an expert on defendant's behalf, and instead, relies on a rigorous cross-examination of the State's witnesses. *See State v. Parker* (Mar. 1, 2000), 9th Dist. No. 98CA007158, at *6, citing *Nicholas,* 66 Ohio St.3d at 436. *Accord State v. Fields* (Aug. 9, 2000), 9th Dist. No. 99CA0062, at *3. Here, **the record reflects Burge's deliberate decision, based on a variety of considerations including discussions with medical professionals, not to seek an expert on Dovala's behalf, but to instead attack the credibility and findings of the State's experts. Giving due deference to counsel's decision, we cannot conclude that the failure to obtain an expert under these circumstances constitutes ineffective assistance of counsel.** *Williams*, 74 Ohio App.3d at 695. Moreover, "[d]ecisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics." *State v. Pordash*, 9th Dist. No. 05CA008673, 2005–Ohio–4252, at ¶ 21, quoting *State v. Ambrosio*, 9th Dist. No. 03CA008387, 2004–Ohio–5552, at ¶ 10. In that same regard, we agree with other courts that have held that a post-conviction relief petitioner cannot demonstrate ineffective assistance of counsel by presenting "a new expert opinion that is different from the theory used at trial." *State v. Smith*, 4th Dist. No. 09CA3128, 2011–Ohio–664, at ¶ 29, quoting *State v. Cornwell*, 7th Dist. No. 00–CA–217, 2002–Ohio–5177, at ¶ 46. *Accord State v. Tenace*, 6th Dist. No. L–05–1041, 2006–Ohio–1226, at ¶ 26; State v. White (Aug. 7, 1998), 5th Dist. No. 97COA01229, at *9; and *State v. Combs* (1994), 100 Ohio App.3d 90, 103. "Ohio case law clearly shows that alternate or supplementary theories from expert witnesses, which are presented in post[-]conviction proceedings, are not

sufficient to establish ineffective assistance of counsel [.]" *Smith* at ¶ 31. Despite Devan's claims that Burge's cross-examination was not effective, the record reveals that Dr. Matus agreed that it was possible that increased cranial pressure could have caused an existing fracture to expand in size, resulting in a fracture similar to the one that occurred here. *Accord In re J.B.*, 12th Dist. Nos. CA2005–06–176, CA2005–07–193, CA2005–08–377, 2006–Ohio–2715, at ¶ 34–35 (rejecting a claim of ineffective assistance in a petition for post-conviction relief where counsel was able to elicit testimony from the coroner on cross-examination admitting that it was "possible" that there was another cause of death, but counsel had not presented any corresponding expert on behalf of the defendant).

{¶ 22} **To the extent Dovala takes issue with Burge's failure to properly investigate her claims, Burge testified that he sought the expertise of both an OB/GYN and a neurologist as well as conducting supplemental research on alternative causes of infant death in such circumstances. Further, Burge's initial and supplemental requests for discovery provide evidence that he pursued relevant information necessary to prepare a defense in this case.** This Court will not employ "hindsight * * * to distort the assessment of what was reasonable in light of counsel's perspective at the time[.]" *State v. Gapen*, 2d Dist. No. 20454, 2005–Ohio–441, at ¶ 30. Therefore, the trial court did not abuse its discretion in denying Dovala's petition for post-conviction relief because there was no evidence that Burge was deficient in performing his duties as counsel. *Strickland*, 466 U.S. at 687. Having concluded that Burge was not deficient in acting as counsel, we need not address whether she suffered any prejudice. *Bradley,* 42 Ohio St.3d at 143*; Strickland*, 466 U.S. at 697. Consequently, Dovala's assignment of error is overruled.

*Dovala*, 2011 WL 2533915 at * 5-8 (emphasis added).

In its 2016 decision affirming the denial of Dovala's Motion for Relief under Civ. R. 60(b), the state appellate court considered Dovala's ineffective assistance claim in light of the new evidence presented via the affidavits of Dr. Swanson and Mr. Burge, and the deposition of Ms. Perkovic:

{¶ 7} Several of the claims in Dovala's petition for postconviction relief alleged deficient performance by trial counsel, Attorney James Burge, in connection with his investigation of the charges, preparation of a defense, and presentation of expert witness testimony. In a prior appeal, this Court concluded that these claims were not barred by *res judicata. Dovala*, 2009–Ohio–1420, at ¶ 21. In support of her petition, Dovala presented the testimony of Dr. Audrius Plioplys, a retired pediatric neurologist who opined that the victim's injuries were not caused by blunt force trauma, but by compressive force applied directly to a single point on the skull. In his affidavit and testimony in support of the petition, Dr. Plioplys also disagreed with the State's trial experts regarding the timeframe during which the victim's injuries could have

occurred. Specifically, he concluded that he could not narrow the timeframe further than the twenty-four hour window before the victim's death.

{¶ 8} The videotaped deposition of Attorney Burge was admitted into evidence during the hearing on Dovala's petition. Attorney Burge explained that according to his understanding of the timeline and potential testimony by the State's experts, the onset of the victim's symptoms happened too late in the day to attribute them to an injury that occurred before he was in Dovala's care. He also explained that Dovala had taken the position, as memorialized in a recorded interview with police, that no one else in her home had injured the victim. In response to questions about whether another child in the home could have injured the victim—the theory espoused by Dr. Plioplys— Attorney Burge reasoned that although the argument could be made despite Dovala's own prior statements, it was not a defense that would have proved successful. Attorney Burge testified that he believed that the only avenue open to him in light of the substantial limitations imposed by Dovala's prior statements was a defense that the injury was a preexisting or congenital condition.

{¶ 9} Attorney Burge then described how this defense unfolded. He testified that he consulted Dr. Thomas Swanson, whose name he recalled incorrectly at the time, between 60–90 days before trial. Attorney Burge acknowledged that Dr. Swanson was married to his co-counsel at that time, which provided him the opportunity to review records. Attorney Burge stated that the case was one of interest to Dr. Swanson, and that he was not paid a fee. According to Attorney Burge, he did not pursue a formal consultation with Dr. Swanson because he believed him unlikely to opine that the victim suffered anything other than an inflicted injury. Attorney Mark Devan, an expert who testified regarding Attorney Burge's performance during the hearing on Dovala's petition, agreed that Attorney Burge's interaction with Dr. Swanson could be characterized as an "unpaid, informal consult" by the "ex-husband of co-counsel."

{¶ 10} Dovala's motion for relief from the trial court's judgment denying postconviction relief was based on an affidavit obtained from Dr. Swanson. In that affidavit, Dr. Swanson affirmed that he was married to Attorney Burge's co-counsel at the time of Dovala's trial and that he discussed the case with her "in a casual manner at our home." He denied that he discussed the case directly with Attorney Burge, and stated that he did not "officially opine anything regarding the mechanism of the death" involved in this case. He also recalled that he "did not have access to or review the records in any detail that would have allowed a learned opinion in this case." (Emphasis added.) Attorney Burge provided an affidavit in response to Dovala's motion. In that affidavit, he clarified that any consultations with Dr. Swanson were informally conducted through co-counsel, to whom Dr. Swanson was married at the time. Attorney Burge adhered to his recollection that Dr. Swanson believed that the injury involved in this case was inflicted, and Attorney Burge reiterated that because the theory of Dovala's defense had already been developed at that time, he did not believe that a formal consultation with Dr. Swanson would have been helpful.

28

{¶ 11} While Dovala's motion was pending, counsel deposed trial co-counsel, Attorney Laura Perkovic. Attorney Perkovic's recollection of details surrounding the defense was hampered by the passage of time. Although she disagreed with parts of Attorney Burge's affidavit, she also disagreed with elements of Dr. Swanson's affidavit. The substance of her testimony, however, confirmed that Attorney Burge did ask her to speak to Dr. Swanson about Dovala's case, and that she did so, providing access at least to the autopsy photographs and report. According to Perkovic, Dr. Swanson would not provide an opinion without being formally retained, but that he did tell her that because the case involved "brain trauma," he would be qualified to formally consult on the case.

***

{¶ 13} This Court concludes that the trial court did not abuse its discretion by determining that this is not the unusual case involving undisclosed circumstances that inherently affect the accuracy and reliability of the judgment at issue such that relief is warranted under Civ.R. 60(B)(5). Although the witnesses' recollections of the details differ in light of the passage of time, a witness during the postconviction proceedings summarized Attorney Burge's consultation with Dr. Swanson in a manner consistent with the new testimony: it was informal, Dr. Swanson was not retained, and it occurred because Dr. Swanson was married to co-counsel. This much was clear as a result of Attorney Burge's deposition during the postconviction proceedings, and it was not an abuse of discretion for the trial court to conclude that the information set forth in Dr. Swanson's affidavit did not undermine the accuracy and credibility of the judgment.

*Dovala*, 2016 WL 1295954 at * 2-4.

Dovala argues that the state appellate court unreasonably applied *Strickland* in determining that Mr. Burge's failure to investigate did not constitute deficient performance.[10]  (Doc. No. 27.) Citing the disparities between Burge's testimony, Dr. Swanson's affidavit, and Ms. Perkovic's testimony, she maintains that both the Magistrate Judge and the state courts were unreasonable in

---

[10] Although Dovala cites generally to § 2254(d)(2) in her Objections, she does not clearly argue, or cite any legal authority in support of the proposition, that the state court's decisions were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Nor does Dovala clearly advance such an argument in her Traverse.  Accordingly, the Court examines Dovala's arguments in the context of § 2254(d)(1); i.e. whether the state court decisions were contrary to, or involved an unreasonable application of, clearly established federal law.

determining that Burge engaged in any meaningful consultation with neurologist Dr. Swanson regarding either the mechanism of Riley's injury, or the timeframe within which the injuries that caused Riley's death occurred. (*Id.*) Dovala asserts that Burge's failure to consult with Dr. Swanson (or other experts) regarding the mechanism or timeframe of Riley's injuries constituted deficient performance, particularly in light of the post-conviction testimony of Dr. Plioplys that Riley's injuries could have occurred within 24 (as opposed to 3 to 5) hours of his death. (*Id.*)

The State did not file a response to Dovala's Objection.

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *accord, e.g., Wiggins*, 539 U.S. at 521–22. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. As the Sixth Circuit has explained, "the deference a reviewing court must give to counsel's strategic decisions depends on the adequacy of the investigation underlying counsel's decisions." *Smith v. Jenkins*, 609 Fed. Appx. 285, 292 (6th Cir. 2015) (citing *Wiggins*, 539 U.S. at 521). Failure to make such an investigation "must be supported by a reasoned and deliberate determination that investigation was not warranted." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994) (interpreting *Strickland*). In sum, "'[a] lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance.'" *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (quoting *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir.2006)).

30

In *Richey, supra*, the Sixth Circuit closely examined the scope of trial counsel's duties to investigate under *Strickland*.  In that case, Richey was charged with intentionally setting fire to the apartment of Hope Collins, resulting in the death of Collins' two-year old daughter.  *Richey*, 498 F.3d at 346.  The State argued that Richey set the fire by using accelerants, relying on the testimony of two expert witnesses from the state fire marshal's office and the state arson lab.  *Id*. at 347.  Richey's trial counsel, William Kluge, retained an expert, Gregory DuBois, to investigate the cause of the fire and test the conclusions of the State's experts.  *Id.*  DuBois met with one of the State's experts, for the purpose of having the State's expert review the forensic evidence and explain his conclusions. *Id.* at 348.  DuBois then informed trial counsel that he agreed with the State's conclusion that the fire was caused by arson.  *Id.*  Trial counsel did not question DuBois about the nature of his investigation or ask him to explain why he concurred with the State.  *Id.*  At trial, defense counsel did not introduce any competing scientific evidence to rebut the State's findings and instead, relied on his cross-examination of the State's experts. *Id.*  Richey was convicted of aggravated felony murder and sentenced to death.  *Id.* at 346.

In post-conviction proceedings, Richey retained two fire experts who opined that the State used flawed scientific methods not accepted in the fire-investigation community to determine that arson caused the fire and that the samples of carpeting and wood from Collins's apartment did not contain evidence of accelerants.  *Id*. at 348.  In particular, one of Richey's new experts testified that the State's experts "ignored facts that make it just, if not more, likely that the June 30, 1986 fire was caused by the careless discard of smoking materials than that the fire was caused by arson." *Id.*  The state post-conviction court dismissed Richey's petition, and the state appellate court affirmed.  *Id*.

Richey then filed a federal habeas petition, which the district court denied.  *Id.* at 349.  The Sixth Circuit reversed, but the decision was later vacated and remanded by the United States Supreme Court with instructions to further consider several issues, including Richey's ineffective assistance claim.  *Id.*  On remand from the Supreme Court, the Sixth Circuit found that the state courts had unreasonably determined that Richey's trial counsel was not ineffective.  In pertinent part, the court explained as follows:

> The scientific evidence of arson was thus fundamental to the State's case. Yet Richey's counsel did next to nothing to determine if the State's arson conclusion was impervious to attack. True, Richey's counsel retained DuBois to review the State's arson evidence, so this case does not exemplify that most egregious type, wherein lawyers altogether fail to hire an expert. **But the mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable.** *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 (stating that defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").  At bottom, the record shows that Richey's counsel did not conduct the investigation that a reasonably competent lawyer would have conducted into an available defense-that the fire was not caused by arson-before deciding not to mount that defense.
>
> \*\*\*
>
> **[I]t is inconceivable that a reasonably competent attorney would have failed to know what his expert was doing to test the State's arson conclusion . . ., would have failed to work with the expert to understand the basics of the science involved, at least for purposes of cross-examining the State's experts, and would have failed to inquire about why his expert agreed with the State. A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is.**  \*\*\*
>
> The point is not that Kluge had a duty to shop around for another expert who would refute the conclusions of DuBois and the State's experts. **The point is that Kluge had a duty to know enough to make a reasoned determination about whether he should abandon a possible defense based on his expert's opinion.**  *See Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d

ed. 1982 Supp.)). **Having simply been served up with DuBois's flat agreement with the State, and not having known either what DuBois did to arrive at his conclusion or why he came out where he did, Kluge was in no position to make this determination**. *See id*. at 374, 125 S.Ct. 2456 (holding that trial counsel performed deficiently when they failed to investigate a court file containing mitigating evidence even though they pursued other avenues of unearthing mitigating information, including interviewing the defendant and his family members and consulting mental-health professionals); *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (stating that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision"); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir.1995) (holding that even where defense counsel elicited a concession from the state's expert that whether a particular blood type was on a knife was entirely speculative, defense counsel was defective for having failed to take measures "to understand the laboratory tests performed and the inferences that one could logically draw from the results"); *Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir.2005) (holding that where defense counsel visually inspected the fire scene himself, talked with the state's experts, did some limited reading, and talked with other defense attorneys, he nonetheless failed to adequately investigate an available "no arson" defense).

*Id.* at 362-363 (emphasis added).  Applying AEDPA deference, the Sixth Circuit concluded by finding that "because the deficient performance of Richey's counsel undermines our confidence in the outcome of his trial, and because we believe that the Ohio state courts unreasonably applied *Strickland* in determining otherwise," habeas relief was warranted.  *Id.* at 364.[11]  *See also id.* at 361 (finding that "ample evidence exists establishing that the state courts unreasonably applied *Strickland* in holding that Richey had received constitutionally effective assistance of counsel.")

Since *Richey,* the Sixth Circuit has continued to grant habeas relief where trial counsel fails to conduct a reasonable investigation regarding potential expert testimony, even in cases where AEDPA deference is applied.  S*ee, e.g., Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) (finding

---

[11] In so finding, the court also referenced its previous analysis of this claim prior to remand from the United State Supreme Court.  In that previous decision, the Sixth Circuit expressly noted that the state courts had considered Richey's ineffective assistance claim on the merits, and found that the state court's determinations as to both deficient performance and prejudice were unreasonable applications of *Strickland*.  *Richey v. Bradshaw*, 395 F.3d 660, 682, 686, 688 (6th Cir. 2005).

ineffective assistance where trial counsel failed to investigate causation defense and noting ""[w]hile the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it." ); *Dendel v. Washington*, 647 Fed. Appx. 612, 615 (6th Cir. 2016) ("We have made clear that an attorney cannot hire an expert, give him whatever evidence he happens to have on hand …and accept the report without further discussion . . . A reliance on uncorroborated evidence dealing with a material issue, such as the cause of death in a murder trial, constitutes as deficient performance.") (citing *Couch,* 647 Fed. Appx. at 615.)

Here, it is undisputed that the primary issues at trial related to the cause and timing of the injuries that resulted in Riley's death.  The State's theory was that (1) Riley suffered a skull fracture as a result of blunt force trauma to his head (most likely due to impact with a corner), and (2) this injury occurred within three to five hours of his death.[12]  To substantiate its theory, the State relied on the expert testimony of Lorain County Coroners Dr. Paul Matus and Dr. John Daniels.  Even a brief perusal of Dr. Matus's and Dr. Daniel's testimony reveals the highly complex and technical nature of these medical issues.  *See generally* Doc. No. 22 at Tr. 187-365, PageID#s 1271-1451 (Dr. Matus) and Tr. 562-587, PageID#s 1650-1675 (Dr. Daniels).

Burge, however, decided not to present any expert testimony on Dovala's behalf, concluding that the best way to challenge the State's case was through a vigorous cross-examination of Dr. Matus and Dr. Daniels.  The state appellate court concluded that this decision was the result of a reasonable investigation based on its finding that Burge informally consulted with Dr. Swanson before deciding

---

[12] The record reflects that Riley was pronounced dead at 6:11 p.m. on Friday, February 6, 2004.  (Doc. No. 22 at Tr. 333, PageID# 1419.)

34

to pursue this strategy.[13]  Specifically, based on its review of Burge's affidavit, Dr. Swanson's affidavit, and Ms. Perkovic's deposition, the state appellate court determined that Dr. Swanson reviewed the autopsy report and rendered an unofficial opinion through co-counsel Ms. Perkovic that Riley's injuries were caused by brain trauma (i.e., that they were "inflicted" injuries).  Based on this informal "consultation," combined with Burge's own self-professed knowledge of and research regarding medical issues, the state appellate court concluded that Burge conducted a reasonable investigation and that his performance was not deficient under the first prong of *Strickland, supra.*

For the following reasons, and upon careful review, the Court finds that the state appellate court unreasonably concluded that Burge provided effective assistance of counsel.  Dr. Swanson did not provide a written report regarding his conclusions.  Rather, his only articulation of his informal "opinion" regarding causation was in a casual conversation at home with Ms. Perkovic, which was then conveyed to Mr. Burge.  It is undisputed that Burge never spoke directly with Dr. Swanson prior to trial.  Burge did not confirm that Dr. Swanson had reviewed all of Riley's medical records nor did he ever ask Dr. Swanson if there were any other materials or documents that he might need to review to reach an opinion regarding the cause of Riley's death.  Moreover, at no point in time did Burge ever inquire of Dr. Swanson regarding the basis for his purported agreement with the State's experts that Riley's injuries were inflicted.  Indeed, Burge did not ask Dr Swanson *any* questions regarding his review of Riley's case.  Rather, like the deficient trial counsel in *Richey*, Burge simply accepted

---

[13] As noted *supra*, Burge also consulted with Dr. Bartek and Dr. Clark about the possibility of conducting genetic testing of Riley's parents with the hopes of demonstrating a genetic defect or weakness in Riley's skull that caused the skull fracture that resulted in his death.  However, Burge testified that he abandoned this strategy after Dovala told him she did not want to risk a negative result.  Dovala disputes Burge's testimony.  As noted *supra*, Dovala testified in her deposition that she left the decision up to Burge and was under the impression that the testing had been done, until she learned just weeks before her trial that it had not, in fact, been done.  As Dovala does not challenge Burge's decision to forego this testing, the Court does not address it herein.

Dr. Swanson's opinion that Riley's injuries were the result of brain trauma without either (1) asking Dr. Swanson what materials he considered to evaluate Riley's injuries; (2) working with Dr. Swanson to understand the "basics of the science involved;" or (3) inquiring about why Dr. Swanson agreed with the State that Riley's injuries were inflicted. *Richey*, 498 F.3d at 362-363.

Burge's failure to have any discussions with Dr. Swanson about his opinion regarding the causation of Riley's injuries is particularly troubling for several reasons.  It is undisputed that Dr. Swanson was the only neurologist that Burge consulted in preparing for Dovala's trial.  Having decided to forego the genetic testing defense suggested by Dr. Bartek and Dr. Clark, Burge was entirely reliant on Dr. Swanson's opinion in formulating an alternative theory of defense.  And, yet, he never spoke with Dr. Swanson.  He never discussed the case with Dr. Swanson or asked him a single question as to the basis for his opinion that Riley's injuries were inflicted.  As noted *supra,* Mr. Burge was lead counsel in Dovala's case and was the architect of her defense.  At the time of Dovala's trial, Burge had over thirty years of experience as a criminal defense lawyer and had tried several infant homicide cases.  By contrast, Ms. Perkovic's criminal practice was "just beginning." (Doc. No. 31 at Tr. 11.)  She testified that she had a "limited role" in the Dovala case, was "only provided with select materials," and "worked peripherally or on the sidelines."  (*Id*. at Tr. 13-14.) Given the importance of Dr. Swanson's opinion on this critical issue in the case, it was not reasonable for Mr. Burge to simply rely on Ms. Perkovic's description of her conversation with Dr. Swanson. This is particularly the case given the disparities in their relative experience levels and the fact that Ms. Perkovic had only limited access to select case materials.

As the Sixth Circuit noted in *Richey,* "[a] lawyer cannot be deemed effective when he hires an expert consultant and then either willfully or negligently keeps himself in the dark about . . . what

the basis for the expert's opinion is." *Richey*, 498 F.3d at 363.  *See also Couch*, 632 F.3d at 246 ("An attorney cannot hire an expert, give him whatever evidence he happens to have on hand . . . and accept the report without further discussion.")  Here, Burge's "consultation" with Dr. Swanson about the cause of Riley's injuries was perfunctory, at best, and included no meaningful discussion or analysis of the basis for Dr. Swanson's opinion.  Although trial counsel may rely on an expert's opinion in formulating trial strategy, "this common-sense principle does not give trial counsel a free ride when it comes to the obligation to undertake a 'thorough investigation of law and facts relevant to plausible options' for a defense." *Couch*, 632 F.3d at 247.

Most egregiously, however, it is clear from a review of the state court record that Burge never consulted with *any* expert regarding the other critical medical issue in Dovala's case; i.e., the timing of the injuries that caused Riley's death. Although the state courts found that Burge consulted with Dr. Swanson regarding the *cause* of Riley's injuries (i.e., "brain trauma"), the state trial court expressly found that Dr. Swanson did not render an opinion regarding the *timing* of those injuries and the state appellate court affirmed that decision.  *See* Doc. No. 7-2, Exh. 62 ("The Court does **not** find that Swanson opined that the onset of symptoms would have occurred very quickly") (emphasis added); *Dovala,* 2016 WL 1295954 at * 2-4.[14]  Indeed, there is no evidence (either from Burge, Swanson, or Perkovic) that Dr. Swanson ever rendered any opinion (whether formal or informal) regarding the timeframe within which Riley's injuries would have occurred relative to his death.  Nor

---

[14]  The state court trial court concluded, without further explanation, that Burge's failure to obtain an opinion from Dr. Swanson regarding the timing of Riley's injuries "did not inherently affect the accuracy and the reliability of the trial court's judgment."  (Doc. No. 7-2 at Exh. 62.)  The state appellate court affirmed, but provided no discussion or analysis of the impact of Burge's failure to obtain an opinion regarding the timing issue.

is there any evidence that Burge ever consulted with any other medical professional or other expert witness regarding this particular issue.

This is a very significant omission. The timing of the injuries that caused Riley's death was the subject of considerable testimony at trial, both from Dr. Matus and Dr. Daniels.  As noted *supra,* each of these doctors testified that, in their professional opinions, the injuries that caused Riley's death occurred within three to five hours of his death.  This conclusion was based on medical and scientific issues beyond the knowledge of the ordinary layperson.  For example, Dr. Daniels testified as follows:

> A:    What we try and determine with injuries is the interval between injury and death, if that's possible.
>
> Q.    And what type of things did you do in this particular instance to make that determination?
>
> A.    Well, first, gross observations of the blood found within the cranial cavity, noting whether it had a fresh appearance or whether  it was covered with fibrin, which is part of the clotting process, or whether it was organized that is very old, part of the process where the body actually reabsorbs a blood clot. Additionally, I took microscopic sections of these blood clots and looked at their character under the microscope to see how developed they were, what elements constituted them and that could be used in aging.
>
> Q.    How is that, Doctor?  Could you explain fibrin and how you would examine it and determine the interval you just discussed?
>
> A.    In any blood, any part of the body, we all experienced this, the blood clots, you'll notice what you don't see is that fibrin, which is a protein.  The body precipitates out of the blood when there is injury.  And this forms a mesh that forms an initial plug.  Over time, this fibrin accumulates, becomes very dense. The blood cells that are trapped in fibrin at first begin to degenerate after a few days.  Eventually more firmer, more tenacious fiber is laid down over the fibrin, old, reabsorbed blood is carried away, and eventually the clot is totally absorbed.  You might only see very small evidence of that and a small scar, depending on the body's site.

> This whole process, depending on the body site, can take up to months to complete.  But there are definitive -- there are definitive times where you can -- you can expect to see certain changes.  Yes, there is a range, you know, but you're not going to see a well-organized clot early in the process.

> Q.    And in this particular instance, viewing the slides and sections of the clot that were taken during the autopsy, what can you tell us about those observations?

> A.    This is a very -- these are very fresh hemorrhages; they occurred very soon before death.

> Q.    And how does the body's ability to repair itself enable you to make that determination outside of the fibrin?  Any other factors?

> A.    Well, the accumulation of inflammatory cells and at an area of injury, which not here, the blood cells in the initial hemorrhages, the initial bleeds are still intact.  They look perfectly fine.  They haven't begun to degenerate.  And additionally, the amount of fiber there is very little, very little fiber.  There is some, but we're not having whole areas replaced by fiber, covered by fiber.  So it's an early clot.

(Doc. No. 22 at Tr. 567-569, PageID#s 1655-1657.)

Despite the complexity of this medical issue, and the importance of the issue to the State's case against Dovala, Burge testified at deposition that he did not consult an expert on this issue because he did not believe he could widen the timeframe within which Riley's injuries occurred to exclude Dovala as a suspect:

> Q.    Was it your opinion that it was not possible to open the window of potential time of death wide enough to get your client out of the picture?

> A.    That was my opinion.

> Q    And that was your opinion because you had handled previous cases involving subdural hematomas all of which involved recent injuries, correct?

> A.    Well, that together with the fact that, except for, I'd like to say that I've read everything in print, the medical literature, although that's not possible, but what's in the English language anyway, and I have never encountered an opinion where the onset of symptoms could [be] as long as this.

(Doc. No. 22 at PageID# 1979-1980.)   When asked whether he consulted with any doctors about this issue, Burge at first indicated that "Watson [sic] felt the same way" but later acknowledged that he had not actually asked Dr. Swanson about the timing of Riley's injuries.  (*Id* at PageID# 1980, 2008-2009.)  Further, Burge confirmed that he never asked any other doctors for their analysis or opinions about this particular issue.  (*Id*. at PageID# 1980.)

Dovala's post-conviction attorneys, however, did seek a medical opinion regarding the timing of Riley's injuries. As discussed *supra*, Dovala's new counsel consulted with neurologist Audrius Plioplys, M.D.  (Doc. No. 7-1 at Exh. 24, PageID#s 283-285.)  Dr. Plioplys testified that he was "board certified in neurology with special competence in child neurology" and had over 20-years experience in that field.  (Doc. No. 22 at PageID#s 2034-2036.)  Contrary to Mr. Burge, Dr. Plioplys did not find it implausible that Riley's injuries could have occurred earlier than three to five hours before his death.   To the contrary, Dr. Plioplys opined that "there is no medical reason why the head injury to Riley Smath necessarily occurred after 3:00 p.m. on February 6, 2004" and that "based upon neuropathology of the red and white blood cells of the cerebral hematoma, the injury could have been caused anytime between approximately one day prior to death." (Doc. No. 7-1 at Exh. 24, PageID#s 283-285.)  Dr. Ploiplys reiterated this conclusion during Dovala's post-conviction hearing. (Doc. No. 22 at PageID#s 2065-2072.)  Specifically, Dr. Plioplys testified as follows:

> Q       Okay.  In this finding, are we dealing basically with the timeline between injury and death?
>
> A       Yes, that's what's being addressed here.
>
> Q       And are you aware then that that timeline, as far as the forensic trial testimony by the State, was three to five hours?

40

A      Yes, that was mentioned.  That's correct.  It's a little different from this number here.

Q      And I take it you disagree with that -- with the State's evidence on that issue?

A      Well, I don't -- in the trial testimony, and I tried to review it very carefully, I don't see what the basis for the three to five-hour determination was.  It seemed to be rather arbitrary numbers being selected.  It wasn't clear to me where that is.

The only thing that I see in the material that I reviewed that gives an idea are the microscopic pictures of the subdural hematoma, and that shows that the red blood cells are still intact.  It shows that this is not -- it's not a chronic subdural.  It's a relatively recent one.

And, in my understanding of neuropathology, that this kind of an injury would have had to have taken place within the 24 hours of death.  Not more than 24, but somewhere within 24 hours time frame.  And so that's the only kind of time frame that I think the information gives us here.

(*Id.* at PageID#s 2065-2066.)

As the Sixth Circuit recently reiterated, "the 'most egregious' type of failure to investigate is where 'lawyers altogether fail to hire an expert."  *Stermer v. Warren*, 959 F.3d 704, 738 (6th Cir. 2020) (quoting *Richey*, 498 F.3d at 362).  Here, the question of when the injuries that resulted in Riley's death were inflicted was a central issue at trial.  Based on Dovala's statements to the police, Burge had already rejected the idea of arguing that another adult or child in Dovala's home could have inflicted Riley's injuries.  Further, he had already abandoned a defense based on genetic testing of Riley's parents, ostensibly because according to Burge, but disputed by Dovola, Dovala had directed him to do so.  Thus, the importance of calling into question the timeframe within which Riley's injuries could have been inflicted was paramount.  And yet Burge failed to consult any medical professionals regarding this issue, either to call as experts at trial or to assist him in his cross-examination of Dr. Matus and Dr. Daniels.  As evidenced by Dr. Pliopys's affdavit and trial

41

testimony, it would have been possible to mount a defense based on the timing of Riley's injuries.

Burge, however, did not know this, because he failed to consider the possibility that his own medical

knowledge was limited.[15]  "While different circumstances might dictate a different result, there was

no reasonable basis for [Burge] not to have consulted" an expert.  *Stermer*, 959 F.3d at 739.  The state

appellate court's determination to the contrary is an unreasonable application of *Strickland*.

This is particularly the case given Burge's own admission that the theory of his defense at

trial through cross-examination of Dr. Matus was "crap" and "had no basis in medicine."  (Doc. No.

22 at Tr. 32-33, PageID#s 1975-1976, 2010.)  During his cross-examination of Dr. Matus, Burge

questioned Dr. Matus regarding the possibility that Riley could have sustained a skull fracture during

birth, and that such a fracture could have gone undetected by his doctors.  Burge then cross-examined

Dr. Matus about the possibility that Riley suffered from craniosynostosis, a genetic condition that

would have caused Riley's brain to outgrow his skull, causing intracranial pressure and swelling that

would have exacerbated such a pre-existing fracture.  Dr. Matus did acknowledge in cross-

examination that "theoretically, anything is possible."  (Doc. No. 22 at Tr. 344, PageID# 1430.)

However, he was quickly rehabilitated on re-direct, as follows:

> Q.  And in terms of the questioning from Mr. Burge about intracranial pressure and swelling, would that swelling, based on your training and experience, cause a skull in an infant to implode?
>
> A.  No.

(*Id.* at Tr. 358, PageID# 1444.)

---

[15] Mr. Burge acknowledged in deposition that he had no medical background or training, other than what he learned as attorney.  (Doc. No. 22 at Tr. 53-54, PageID#s 1996-1997.)

When asked in deposition about his decision to pursue this line of cross-examination, Burge testified that he did not believe his defense theory had any support in the medical literature:

> Q. Well, if I'm [the prosecutor], there is a negative [genetic] test, I bring into the jury that the test was done and it's negative, sure, it's not a good trial occurrence for the defense, but isn't it still true that Dr. Clark could have told the jury that this doesn't have to be a genetically inherited problem, that it can occur from a number of other syndromes or a number of other causes, if that's true?
>
> A. He would never have said that.
>
> Q. How do you know?
>
> A. I know that because the theory I presented to the jury, the theory that I presented in my cross-examination of Dr. Matus, is, nowhere is recognized in the medical literature. When Dr. Matus testified that, yes, a linear fracture could have occurred that grew and became a, I think there were actually three lines or four lines in this fracture, and he agreed that this could happen, I knew from the literature that he was wrong.
>
> Q. All right. So is it fair for me to ask then whether you were pursuing a theory that had no basis in medicine?
>
> A. Exactly.
>
> **
>
> Q. And to clarify, you don't believe you could have used Dr. Clark to validate the craniosynostosis theory, that is the brain outgrowing the skull; as a possibility for what happened here?
>
> A. No, because I saw no, I didn't see any reference in the literature that would have indicated-- given this particular child's condition, I didn't think there were any facts -- I think, was your question, did I think Dr. Clark could validate the linear fracture sustained at birth together with the fracture that was found at autopsy, did I, do I think he could have supported that theory, no.

(*Id.* at Tr. 32-33, 40-41, PageID#s 1975-1976, 1983-1984.)  Burge acknowledged in deposition that he did not consult any medical professionals regarding the theories (discussed above) that he presented during Dr. Matus' cross-examination.  (*Id.* at Tr. 41-42, PageID# 1984-1985.)

43

In sum, the Court finds that the state appellate court's determination that Burge's performance was not deficient is an unreasonable application of *Strickland*. Burge did not conduct a reasonable investigation regarding either the cause of Riley's injuries or the time frame within which those injuries could have occurred relative to Riley's death. Both of these issues were central to the State's case and of paramount importance to Dovala's defense. Yet, Burge did not consult a single doctor regarding the timing of Riley's injuries, either to present in expert testimony or to assist in his cross-examination of Dr. Matus and Dr. Daniels. Moreover, Burge's blanket acceptance of Dr. Swanson's alleged opinion regarding the cause of Riley's injuries was not well-informed. The Court recognizes the high level of deference that must be accorded to the state court's decision under AEDPA. However, under the particular circumstances presented herein and for all the reasons discussed above, the Court cannot find that the state court's decision was a reasonable application of *Strickland*.

The Court must next consider whether Burge's deficient performance resulted in prejudice to Dovala. *Strickland*, 466 U.S. at 691–92. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Here, having concluded that Burge's performance was not deficient, the state appellate court did not reach the issue of prejudice.[16] The Sixth Circuit has explained that "[w]hen a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012); *see also Moss v.*

---

[16] *See State v. Dovala*, 2011 WL 2533915 at * 8 ("Having concluded that Burge was not deficient in acting as counsel, we need not address whether [Dovala] suffered any prejudice" under the second prong of *Strickland*.)

*Olson*, 699 Fed. Appx 477, 481–82 (6th Cir. 2017) (explaining why this split standard still applies by reconciling *Harrington*, 562 U.S. at 99, with *Rompilla v. Beard*, 545 U.S. 374 (2005)).   *See also Smith v. Cook,* 956 F.3d 377, 392 (6th Cir. 2020); *Phillips v. Hoffner*, 755 Fed. Appx. 481, 491 (6th Cir. 2018).   Accordingly, this Court considers the issue of prejudice *de novo*.

For the following reasons, the Court finds that Dovala has shown prejudice arising from Burge's deficient performance.  As discussed at length above, the primary issues at trial related to the cause and timing of the injuries that resulted in Riley's death.   Burge presented no expert medical testimony to rebut the State's expert testimony that Riley suffered a skull fracture as a result of blunt force trauma that occurred within three to five hours of his death; i.e, well within the time that Riley was in Dovala's care.  Had Dovala presented the testimony of Dr. Plioplys at trial that Riley's injuries could have occurred at any time within 24 hours of his death (and, thus, when Riley was not in Dovala's care), there is a reasonable probability that the jury would not have found beyond a reasonable doubt that Dovala was responsible for Riley's death.

This is particularly so given "the lack of overwhelming evidence of guilt."  *Couch*, 632 F.3d at 249.  As Dovala correctly notes, the evidence against her was entirely circumstantial.  There was no eye-witness testimony that Dovala injured Riley and she adamantly denied having caused his injuries.  The State presented no theory of motive and could only theorize as to precisely how Riley's injuries occurred.  Under these circumstances, the Court finds that, had the jury been confronted with evidence supporting the possibility that Riley's injuries did not occur when he was in Dovala's care, there is a reasonable probability that it would have returned a different verdict.[17]

---

[17]   As noted above, the Court applies *de novo* review to this issue in light of the fact that the last, reasoned state court decisions on this issue (i.e., the 2011 and 2016 state appellate court decisions) only addressed the deficient performance prong of *Strickland*, and did not consider the prejudice prong.  The Court notes that the state trial court decision denying

Accordingly, and for all the reasons set forth above, the Court finds that state appellate court's determination that Burge's performance was not deficient is an unreasonable application of *Strickland.*  The Court further finds, under the second prong of *Strickland*, that Dovala has shown prejudice arising from Burge's deficient performance.

## VI.    Relief

Having determined that Dovala received ineffective assistance of counsel in violation of the Sixth Amendment, this Court now considers the appropriate relief.

In a habeas proceeding, this Court is vested with the power "to dispose of the matter as law and justice require." *Irvin v. Dowd*, 366 U.S. 717, 728-29 (1961) (quoting 28 U.S.C. § 2243).  Because this Court has already concluded that Dovala's Sixth Amendment right to effective assistance of counsel has been violated, an evidentiary hearing on that issue in state court is unnecessary. Moreover, as the ineffectiveness of Dovala's counsel pervaded and ultimately undermined the reliability of the jury's verdict, a new trial is the only appropriate remedy.  *See Evitts v. Lucey*, 469 U.S. 387, 395 (1985) ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair trial on the merits"); *see also Martin v. Rose*, 744 F.2d 1245, 1252 (6th Cir.1984) (new trial necessary due to constitutionally ineffective assistance of counsel); *Dempsey v. Bobby*, 412

---

Dovala's post-conviction petition did address both prongs of the *Strickland* test.  *See* Doc. No. 7-2, Exh. 41 ("The Court does not find that trial counsel 's performance was incompetent, nor that but for his incompetent performance the outcome of the proceeding would probably have been different.")  Even if the Court were to apply AEDPA deference to the state trial court's finding of prejudice, however, the Court would nonetheless find (for all of the reasons set forth above) that the state court's decision was an unreasonable application of *Strickland.*

46

F.Supp.2d 720, 732 (N.D. Ohio 2005) (same); *Vasquez v. Bradshaw*, 522 F.Supp.2d 900, 932 (N.D. Ohio 2007)( same).

**VII.    Conclusion**

For the foregoing reasons, the Court respectfully declines to adopt the Magistrate Judge's Report and Recommendation.  (Doc. 26.)  The Court hereby conditionally grants a writ of habeas corpus to Dovala. Unless a date for a new trial is scheduled within 120 days, Dovala must be unconditionally released.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  October 19, 2020                              U. S. DISTRICT JUDGE

47